<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 97-2008

                      BECKY J. LICCIARDI,

                     Plaintiff, Appellant,

                               v.

                      TIG INSURANCE GROUP,

                      Defendant, Appellee.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF RHODE ISLAND

            [Hon. Mary M. Lisi, U.S. District Judge]

                             Before

                   Selya, Boudin and Lynch,
                       Circuit Judges.
                                
                                

     

    Leonard Glazer, with whom Frank E. Glazer, Anthony R. Orlandoand Law Offices of Leonard Glazer were on brief, for appellant.
    Carol A. Griffin, with whom Mark T. Nugent and Morrison,
Mahoney & Miller were on brief, for appellee.      

April 10, 1998

 LYNCH, Circuit Judge.  The malfunction of the Free Fall
ride in a Rhode Island amusement park caused it to stop
unexpectedly on the upper runoff track.  The passengers were
jolted.  One passenger, Becky Licciardi, then 20 years old,
complained that her side and ribs hurt and that she was bruised.  
She later developed a far more serious condition, fibromyalgia,
which she believed was caused by the trauma to her from the
accident.  She sued the park, which was in bankruptcy, and the
park's insurer was substituted as defendant.  See R.I. Gen. Laws  
27-7-1 (1994).
 After an eight day trial, a jury returned a defense
verdict.  The defense verdict was procured, however, by trial by
ambush tactics:  the defense Rule 35 medical expert changed course
180 degrees from his report in his testimony on a key topic at the
heart of plaintiff's case.  Further, he went into a new area of
testimony.  There was no prior disclosure of the coming volte face;
indeed there was a misrepresentation in the supplemental answer to
interrogatories filed two days after the jury was impaneled that
the expert's testimony would be the same as in his initial report.  
Plaintiff's counsel protested in vain, objecting to the testimony,
and when that failed, moving for a mistrial and then a new trial.  
Because we believe the district court abused its discretion in
admitting the evidence, we vacate the verdict and remand the case.
                              I.
    On July 10, 1992, Licciardi and her then-fianc, Torrey
LeBlanc, were passengers on the Free Fall ride at Rocky Point
Amusement Park, in Warwick, Rhode Island, when the ride
malfunctioned.  Plaintiff claims that instead of gradually
decelerating as it normally did, the ride stopped with "three
enormous jerks, thrusting her violently forward and back in her
seat before the car came to an abrupt stop on the emergency runoff
track."  The ride operator had to use a specialized tool to release
plaintiff and LeBlanc.  Plaintiff and LeBlanc both testified that
the car felt as if it was crashing into a barricade when it
stopped.  As she climbed off the ride, plaintiff told the ride
attendant that she was in some pain on the right side of her body,
in the area of her ribs.  Some 35 to 45 minutes later, plaintiff
sought medical attention at the Rocky Point first aid station.  The
emergency medical technician on duty examined plaintiff, and noted
slight bruising and tenderness in the area of plaintiff's right
ribs.  He recommended that plaintiff go to a hospital, which
plaintiff declined to do.  Plaintiff filled out an accident report
in which she stated that the "car jerked to a stop [and] I hurt my
right side."
    The next day Licciardi did go to the emergency room at
Tobey Hospital, where she was examined and diagnosed with a
contusion to her right lower ribs.  The examining physician advised
her to avoid lifting activity, to follow up with her regular
physician, and to take pain medication as needed.  Because her
discomfort persisted, plaintiff saw her family physician two weeks
later, at which point she was switched to a different medication.  
Plaintiff returned to college in the fall, but testified that she
remained in constant discomfort, particularly experiencing pain in
her lower right back, as well as pain radiating down her right leg.  
Over the next year, plaintiff continued to report to her physicians
that she was experiencing persistent back, buttock, and leg pain;
that the pain was causing her to lean to the right when she stood;
and that her neck, shoulders, and head were constantly aching.  
Throughout 1993 and 1994 her pain remained essentially unchanged
despite physical therapy, and by the end of 1994 she had developed
a generalized persistent pain and discomfort termed
"fibromyalgia."
    Plaintiff filed this lawsuit on December 28, 1994,
alleging negligence and breach of warranty.  A jury trial began on
June 5, 1997, and lasted until June 19, 1997.  The jury returned a
verdict in favor of the defendant.  Plaintiff filed a motion for a
new trial, which the district court denied after a hearing.  
Plaintiff appeals from the judgment and from the denial of the
motion for a new trial.
    Plaintiff's most meritorious argument on appeal is that
the district court committed reversible error when it permitted
defendant's medical expert to testify in a manner directly
contradictory to and beyond his prior report, where defendant
failed to supplement its answers to interrogatories in order to
alert plaintiff to this turnaround testimony.  We agree.
                             II.
    As of the start of trial, the plaintiff's theory and the
defense theory were straightforward.  The plaintiff's theory was
that the accident on the Free Fall ride was caused by a failure in
the ride's braking systems, which was caused by defendant's
negligent maintenance of the ride.  This accident, in turn, had
caused traumatic injury to Licciardi which eventually led to her
more serious fibromyalgia.  The defense theory was that the only
malfunction in the Free Fall was the failure of a reversing
mechanism, that the braking systems functioned properly, and there
was no negligence.  As for plaintiff's injuries, defendant's theory
was that plaintiff had not proven that the fibromyalgia resulted
from the trauma plaintiff suffered, and that fibromyalgia results
from conditions other than trauma.  Importantly, the defense Rule
35 medical expert, Dr. Morgan, in his report, opined that plaintiff
had indeed suffered a trauma from the accident, but that this
trauma was not the cause of the fibromyalgia.  Thus, a major aspect
of plaintiff's case was built on the sensible belief that the fact
of the trauma was uncontested; the real contest lay elsewhere.
    However, at trial, during his direct examination, the
Rule 35 expert for the first time offered two new items of
testimony.  He opined that plaintiff did not suffer the trauma from
the accident which she claimed.  He also supported that opinion by
saying he had been to the park and had inspected the ride.  He
described the seat and features of the ride, and, although he was
a medical expert, concluded that the features of the seat were such
that they could not have injured plaintiff as she said.  He
described the way in which the forces of deceleration would impact
a passenger on the Free Fall, and asserted that Licciardi's
injuries were not consistent with this type of impact.  It is this
new testimony which is at issue.
    A description of the course of pre-trial discovery and
events at trial sets the context.  In February of 1995, plaintiff
submitted a series of interrogatories to defendant, including
expert interrogatories.  Defendant answered on May 22, 1995,
stating that it "had not yet retained an expert for the trial[, but
retained] the right to supplement this answer in accordance with
the rules of procedure."
    In November of 1995, defendant requested, pursuant to
Fed. R. Civ. P. 35(a), a court order compelling plaintiff to submit
to a physical examination by Dr. Thomas Morgan, a neurologist.  The
court granted the motion, and Dr. Morgan performed a medical
examination of plaintiff on January 18, 1996.  Dr. Morgan took a
full medical history from plaintiff, reviewed her medical records,
and performed his own neurological examination of plaintiff.  After
the examination, Dr. Morgan produced a report, which plaintiff
received in accordance with Rule 35.  The report first detailed
plaintiff's medical history since the Free Fall incident, and then
stated the following:
    After performing this neurological examination  
    and reviewing this patient's medical records,
    I can say with a reasonable degree of medical
    certainty that this patient sustained a bruise
    and strain to her right lower rib and lumbar
    paraspinal area as a result of her accident at
    Rocky Point on 7/10/92.  She was treated for
    this problem conservatively, and as evidenced
    by the physical therapy notes, seemed to
    improve as of September, 1992.  Subsequently,
    the patient went through further evaluations
    with multiple physicians for lumbar pain and
    diffuse body pain, with disturbed posture with
    a tilt to the right; also, complaining of
    headaches and depression; she was given the
    diagnosis of fibromyalgia.  These complaints
    and the fibromyalgia syndrome are not causally
    related to her accident in the amusement park
    at Rocky Point.

The report further stated that,  

    [t]he diagnosis, at the time of the injury and
    within the subsequent six to eight weeks . . .
    was consistent with sprain and strain.  The
    onset was consistent with biologically timed
    relevant factors.  Strains and sprains
    typically last from a few weeks to a few
    months consistent with minor soft tissue
    injury, and this is related to the amusement
    park incident.  The patient's subsequent
    complaints, which ultimately led to
    fibromyalgia syndrome, are not causally
    related to the incident.

(Emphasis added).  The thrust of Dr. Morgan's report, therefore,
was that the accident caused a strain and bruising to plaintiff,
but the later, more serious complaints and the diagnosis of
fibromyalgia were not related to the accident.
    On May 14, 1996, four months after Dr. Morgan examined
plaintiff and issued his report, Dr. Morgan accompanied defendant's
lawyers and engineering expert on a visit to Rocky Point.  The Free
Fall was tested at that time, and Dr. Morgan inspected the ride.  
Although plaintiff's lawyer was present at Rocky Point on the day
of defendant's inspection of the Free Fall, he was not specifically
alerted to Dr. Morgan's presence and inspection of the ride.  
Further, defendant never disclosed until Dr. Morgan was on the
witness stand at trial that Dr. Morgan would change his testimony
as a result, or that he would testify about his observations of the
ride.
    On May 7, 1997, nearly one year after Dr. Morgan's
inspection of the Free Fall, and two days after the jury in this
case was impaneled, defendant gave the following supplemental
answer to plaintiff's interrogatory regarding expert testimony:
    (a) Thomas F. Morgan, M.D., . . . (b) the
    subject matter upon which Dr. Morgan will
    testify is completely set forth in his report,
    dated January 18, 1996, a copy of which has
    already been provided to plaintiff's counsel
    but which is nonetheless attached hereto; (c)
    the substance of facts and opinions upon which
    Dr. Morgan will testify is completely set
    forth in his report, dated January 18, 1996 .
    . . (d) the summary of grounds for each
    opinion is stated in Dr. Morgan's report.

(Emphasis added).
    The plaintiff's case took six days to put in.  Dr. Morgan
testified near the end of trial, starting on day seven of trial.  
At trial, Dr. Morgan was permitted to testify, over plaintiff's
persistent objections, that he examined the Free Fall and its seats
when he visited Rocky Point, and that nothing in the car could have
caused a localized bruise to plaintiff's kidney and ribs.  Dr.
Morgan's testimony included the following:
    Q:  Now, Doctor, what is the mechanism of a
    bruise, a localized bruise occurring?
    A:  The mechanism to get a bruise means that
    you have to have sustained a load or a punch
    or a pressure to the bruised area or that area
    has to push into something, like a
    compression.
    Q:  And Doctor, based upon your examination of
    this gondola, examination of the seat --
    you're actually sitting in it -- based upon
    where Miss Licciardi explained to you where
    the bruise was, based upon the location as
    described in the Tobey Hospital record and
    based upon her description of it as being a
    kidney-like punch, do you have an opinion to a
    reasonable degree of medical certainty as to
    whether or not there is a structure inside the
    ride on the seat which could produce that
    mechanism of injury?
    . . .  
    A:  Yes, I do have an opinion.
    Q:  And what is your opinion, please?
    A.  There is no structure in that seat that
    would give you a localized kidney punch with a
    bruise.

    In addition to testifying that he believed the Free Fall
car could not have caused Licciardi's injury as she described, Dr.
Morgan discussed the engineering and physics of the ride.  He
testified that he was familiar with the forces of deceleration, and
that based upon his understanding of those forces and his
understanding of the ride, it was his opinion that on the ride the
maximum deceleration force would impact a passenger's body "in the
buttock region."  Further, he testified, Licciardi never
complained of nor described any type of injury to her buttocks
following the ride.  None of this testimony was alluded to in Dr.
Morgan's report.
                             III.
    We will disturb a decision to admit or exclude expert
testimony only if there was an abuse of discretion which resulted
in prejudice to the complaining party.  See Poulin v. Greer, 18
F.3d 979, 984 (1st Cir. 1994); cf. General Elec. v. Joiner, 118
S.Ct. 512, 517 (1997) (holding that appeals courts review trial
court decisions to admit or exclude expert testimony under Dauberton an abuse of discretion standard).
    "Recognizing the importance of expert testimony in modern
trial practice, the Civil Rules provide for extensive pretrial
disclosure of expert testimony."  Thibeault v. Square D Co., 960
F.2d 239, 244 (1st Cir. 1992).  Rule 26(e) of the Civil Rules
requires a party to supplement its answers to interrogatories "if
the party learns that the response is in some material respect
incomplete or incorrect" and the other party is unaware of the new
or corrective information.  See Fed. R. Civ. P. 26(e)(2).  That
rule also requires a party to inform another party of a material
change in or addition to information contained in an expert's pre-
trial report.  See Fed. R. Civ. P. 26(e)(1).  This supplementation
requirement increases the quality and fairness of the trial by
"narrowing [the] issues and eliminat[ing] surprise."  Johnson v.
H.K. Webster, Inc., 775 F.2d 1, 7 (1st Cir. 1985) (internal
quotation marks omitted); see Thibeault, 960 F.2d at 244.   
    In order to "ensure that the spirit of open discovery
embodied in Rule 26 is not undermined either by evasion or by
dilatory tactics," Thibeault, 960 F.2d at 244, this court has
looked to a variety of factors in assessing a claim of error under
Rule 26.  Among the factors to consider are "the conduct of the
trial, the importance of the evidence to its proponent, and the
ability of the [opposing party] to formulate a response."  Johnson,
775 F.2d at 8; see also Thibeault, 960 F.2d at 246 ("[T]he focus of
a preclusion [of testimony not previously disclosed to the opposing
party] inquiry is mainly upon surprise and prejudice, including the
opponent's ability to palliate the ill effects stemming from the
late disclosure.").  In Johnson, this court also noted that part of
the purpose of the disclosure and supplementation requirements in
Rule 26 was to alleviate "the heavy burden placed on a cross-
examiner confronted by an opponent's expert whose testimony had
just been revealed for the first time in open court."  775 F.2d at
7.  See also 8 Charles A. Wright et al., Federal Practice and
Procedure  2949.1 (2d ed. 1994) ("[Rule 26] makes a special point
of the importance of full disclosure and supplementation with
regard to expert testimony, a traditionally troublesome area
concerning last-minute changes.").  To increase the effectiveness
of this rule, the Advisory Committee Note suggests that the court
may impose sanctions on one who defies the rule, including
exclusion of evidence, granting a continuance, or other appropriate
action.  See Johnson, 775 F.2d at 7.
    Dr. Morgan's changed testimony on two points was highly
prejudicial to plaintiff's case.  Counsel prepared plaintiff's case
on the assumption that the question of causation regarding the
original localized bruising and trauma was not in dispute, for
defendant's own expert had conceded there was such causation.  
Plaintiff's medical case therefore focused on proving the
connection between the original bruising and the later, more
serious, fibromyalgia.  On the issue of causation of the
fibromyalgia, the parties had battling experts.  Fibromyalgia is a
syndrome of ambiguous origin, as defendant's expert emphasized.  
Both plaintiff's treating physician and her expert testified that
plaintiff's fibromyalgia was caused by the trauma and injuries she
suffered from the accident.
    Scant attention was paid to establishing that the
accident did cause trauma, because it had been conceded by the
defense medical expert.  The record lacks the sort of testimony
which plaintiff would have been put in had plaintiff known this to
be at issue.  Thus, plaintiff was prejudiced by presenting a case
addressed to one key issue, only to have defendant put on a case
addressed to a different predicate key issue.  See Fortino v.
Quasar Co., 950 F.2d 389, 396-97 (7th Cir. 1991) (finding trial
court's admission of testimony erroneous and prejudicial where
plaintiff violated Rule 26 by failing to supplement answers to
interrogatories with the new testimony, where that testimony was
"critical" to the case and completely unexpected from defendant's
point of view); cf. Voegeli v. Lewis, 568 F.2d 89, 96-97 (5th Cir.
1977) (finding trial court's admission of expert testimony
erroneous and prejudicial where expert had changed opinion since
deposition and defendant did not alert plaintiff to this change).
    Moreover, the engineering testimony presented by
plaintiff was addressed to the issue of whether the malfunction in
the Free Fall that caused it to stop abruptly on the upper runoff
was attributed to negligence.  It was not addressed to whether the
plaintiff could have been injured by the seat at the ride as she
claimed.  The only "expert" testimony on this point came from Dr.
Morgan, a Rule 35 medical expert, who went beyond the scope of an
ordinary Rule 35 examination, and far beyond the scope of his
report, in his testimony about the ride itself.  On both of these
points, plaintiff had no opportunity to prepare her own case or
conduct a meaningful cross examination.  See Freund v. Fleetwood
Enters., Inc., 956 F.2d 354, 358 (1st Cir. 1992) (holding that
trial court properly excluded plaintiff's expert testimony where
substance of that testimony was not made known to defendants until
the middle of trial, and noting that "had [defendants] known about
the [expert] testimony sooner, they might well have decided to
counter it, through cross-examination or other expert testimony");
Mills v. Beech Aircraft Corp., 886 F.2d 758, 764 (5th Cir. 1989)
(trial court properly excluded expert testimony where defendant
first learned about additional tests conducted by plaintiffs'
expert when the expert testified at trial, depriving defendant of
the opportunity to engage its own expert to analyze and testify
about the tests); Labadie Coal Co. v. Black, 672 F.2d 92, 94-95
(D.C. Cir. 1982) (finding erroneous and prejudicial district
court's admission of documents where plaintiff was alerted to the
documents for the first time after it had rested its case and on
the last day of trial, and noting that "when the documents were
finally produced, [plaintiff] had little, if any, time effectively
to . . . cross examine [defendant] as to their contents"); cf.Meltzer v. Comerica, __ F.3d __ (1st Cir. 1998) (trial court
properly prohibited defendants from changing their position on a
pre-trial stipulation at the last minute, where such change would
have prejudiced plaintiff).
    There was another aspect of prejudice as well.  
Unbeknownst to plaintiff before trial, her very credibility as to
whether she had suffered the trauma she described from the accident
was challenged.  And that challenge came from defendant's Rule 35
medical expert.  From Dr. Morgan's report, plaintiff had no reason
to believe Dr. Morgan would challenge her credibility on this (or
indeed any) point.  There was no suggestion in that report that
plaintiff was not credible in reporting any of her symptoms,
whether of the trauma or of the fibromyalgia.   
    Defendant makes four arguments as to why any error in
admitting Dr. Morgan's turnaround testimony is not reversible.  
First, defendant claims that Dr. Morgan's new testimony was not
expert opinion testimony at all, but was based purely on his "first
hand observations of the interior" of the Free Fall ride.  No such
distinction was made to the jury nor did defendant offer Dr. Morgan
as a lay witness.  Dr. Morgan was testifying as a medical expert,
offering opinions based on "reasonable medical certainty," and the
jury undoubtedly took all of his testimony to be based on his
expert knowledge.
    Defendant's second argument is equally meritless.
Defendant claims that Dr. Morgan's trial testimony should not have
come as a surprise to plaintiff because plaintiff's counsel was at
Rocky Point on the day of the Free Fall demonstration and
inspection, and he had some information that a Dr. Morgan was
there.  Plaintiff's counsel states that he was not aware that Dr.
Morgan was inspecting the ride, and that even if he was aware of
this, it would be irrelevant because he had no reason to believe
that Dr. Morgan's testimony had changed as a result of the
inspection.  We agree.
    Defendant suggests that because plaintiff was aware of
the presence of a Dr. Morgan at the Free Fall demonstration,
plaintiff should have compelled supplementation of Dr. Morgan's
report or the answers to interrogatories.  But plaintiff was
entitled to assume that defendant would abide by the rules and
inform plaintiff of a material change in Dr. Morgan's opinion.
Indeed, when plaintiff received defendant's "supplemental answers"
two days after jury impanelment and one year after the Free Fall
inspection, any thoughts that Dr. Morgan's opinion may have changed
since his initial report were dispelled by defendant's statement
that Dr. Morgan's testimony was "completely set forth" in his
initial report.
    Defendant's third argument is that even if Dr. Morgan's
surprise testimony did constitute unfair surprise, any error in its
admission was harmless because it was "cumulative" of other
testimony.  This is so, according to defendant, because Torrey
LeBlanc, plaintiff's former fianc who was on the ride with
plaintiff on the day the ride malfunctioned, testified that he did
not recall seeing any protrusions in the car.  But, as plaintiff
aptly notes, LeBlanc did not testify as an expert giving an opinion
as to causation.  Dr. Morgan's testimony was prejudicial to
plaintiff's case because plaintiff did not herself put in expert
testimony to substantiate the causal connection between the Free
Fall incident and the initial bruising; plaintiff understood that
to be a given.
    Finally, defendant argues that the proper remedy for a
Rule 26 violation is not exclusion of the testimony, but a request
for a continuance.  See Newell Puerto Rico v. Rubbermaid, Inc., 20
F.3d 15, 22 (1st Cir. 1994) (affirming trial court's decision not
to exclude testimony despite proponent's failure to supplement
answers to interrogatories under Rule 26, and noting that "[i]f
counsel felt ill-prepared to cross-examine Mr. Villamil when faced
with his testimony at trial, counsel's solution was to request a
continuance").  It is true that, where effective to counteract the
surprise to one party wrought by the other party's failure to abide
by Rule 26, a continuance or the calling of a rebuttal witness is
preferable to terminating the trial and beginning anew.  However,
a continuance is not effective in every circumstance to counteract
the unfair surprise.  See Thibeault, 960 F.2d at 246 ("[A]
continuance is often ineffectual as a sanction and unfair to both
the court and the opposing party.").   
    This is a legitimate question of whether a lesser remedy
-- a continuance -- would have sufficed.  There are several reasons
why a recess and a continuance of a trial would not have been an
adequate remedy.  First, several of our cases preferring a
continuance arise in the context of claimed surprise after there
has been some belated, subtle notice, of a change in an expert's
testimony.  See, e.g., Newell, 20 F.3d at 21-22; cf. Stevens v.
Bangor and Aroostook R.R. Co., 97 F.3d 594, 598-600 (1st Cir. 1996)
(in Federal Employers' Liability Act action against railroad, trial
court properly excluded defendant's proffered evidence of
myocardial infarction plaintiff suffered two weeks prior to trial,
where defendant failed to produce expert testimony explaining
relationship between infarction and plaintiff's work and life
expectancy; defendant had notice prior to trial and two weeks was
enough time to engage expert).  Here, there was no subtle notice of
change in testimony; until Dr. Morgan testified, plaintiff did not
know of his changed position.      Second, even in cases where the
surprise comes at trial, we have considered whether the new
testimony is a departure from the general scheme of the expert's
report.  See Johnson, 775 F.2d at 8.  In Johnson, it was not.  
Here, most assuredly, Dr. Morgan's testimony departed from the
general scheme of the report.  Indeed, it both directly
contradicted a portion of his report and went into an entirely new
area.
    Third, the surprise testimony was not on an arguably
peripheral matter.  It went to the heart of the plaintiff's case,
for reasons we have explained.  The surprise was not only about
whether plaintiff did suffer trauma but that a Rule 35 medical
expert was now testifying as to his observations of the accident
scene and whether plaintiff could have been so injured.  "We think
it is beyond dispute that an eleventh-hour change in a party's
theory of the case can be [as harmful as the introduction of new
expert testimony on the eve of trial], perhaps more harmful, from
the standpoint of his adversary."  Thibeault, 960 F.2d at 247
(citations omitted).  Defendant violated both of Rule 26's dual
purposes -- "narrowing of issues and elimination of surprise."  SeeJohnson, 775 F.2d at 7.   
    Fourth, in considering what plaintiff would have had to
do, even with a recess and continuance, to meet the surprise
testimony, we see no practical outcomes except outcomes which would
have been prejudicial to plaintiff before the jury.  It is likely
that plaintiff would have, after her case had closed, had to recall
almost all of her witnesses, both experts and not, on the point
that the accident at the ride could have and did cause the trauma
she claimed.  Cf. Freund, 956 F.2d at 358 ("[A] continuance midway
through the trial could have meant losing the benefits of
previously cross-examined witnesses . . . .").  Most likely, a
recess would have been required as plaintiff scrambled to get new
evidence, perhaps engaging a new expert.  This recess and
continuance situation would give defendant, who did not bear the
burden of proof, a decided advantage and unfairly tipped the
playing field.
    Fifth, we consider important a factor identified by
Thibeault:  the incentive system created for counsel to engage in
violations of their Rule 26(e).  "If continuances were granted as
a matter of course for violations of Rule 26(e), the rule could
always be disregarded with impunity."  Thibeault, 960 F.2d at 246.  
Here, affirming the verdict would put defendant in an almost no-
lose situation:  if the change in testimony were admitted, it would
severely prejudice plaintiff, and if a recess and continuance were
granted, defendant would still gain an advantage.  On this record
there is little reason to think the actions of defense counsel were
not deliberate.  See Johnson, 775 F.2d at 8 (testimony properly
excluded "where courts have found some evasion or concealment,
intentional or not, on the part of the litigant offering the
evidence").  Such conduct should not be rewarded.
    In concluding, we stress that the solution of a
continuance, where the continuance would be effective, is generally
to be commended.  Evidence and theories evolve in the last minute
preparation for trial and trial itself, when counsel's focus is
most intense.  It is common for there to be some deviation between
what was said in discovery and what comes out at trial, and a
continuance may well be adequate to handle a material deviation.  
But this is an extreme case, both in the prejudice wrought and the
apparent deliberateness of the behavior -- and we have no
hesitation, despite our respect for the trial judge and the general
latitude allowed in such matters, in concluding that in this case
a new trial is necessary.
    Vacated and remanded.

</body>

</html>